FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ APR 25 2006 ★

BROOKLYN OFFICE

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELVILLE BENNETT, ) | No. 02-CV-5232 (JBW) |
| ) | |
| Petitioner, ) | |
| v. ) | MEMORANDUM , ORDER |
| ) | and |
| BRIAN S. FISCHER, et al. ) | JUDGMENT |
| ) | |
| Respondents. ) | |

**APPEARANCES:**

**For Petitioner,**
**Delville Bennett:**     Georgia J. Hinde, Esq.
              1133 Broadway
              New York, NY 10010
                and
              Neil B. Checkman, Esq.
              111 Broadway, Suite 1305
              New York, NY 10006

**For Respondent**
**Kings County District**
**Attorney, by :**     Diane R. Eisner
              Taylor Koss
              Assistant District Attorneys
              360 Jay Street
              Brooklyn, NY 11201-2908

JACK B. WEINSTEIN, Senior United States District Judge:

## I.  Introduction: Procedural History

       This petitioner has been before this court for hearings on a number of occasions post-judgment. He has been heard by the state appellate courts on direct appeal. He has had unsuccessful post-judgment hearings on a number of section 440 applications

1



with attempted state appeals. This court's memorandum and order dismissing the petition on November 20, 2003 is made a part of this present memorandum and order.

By order of October 12, 2004, the Court of Appeals for the Second Circuit granted a certificate of appealability. It remanded the case for exhaustion of state remedies, and for reconsideration by this court once the claim that petitioner had been denied effective assistance of trial counsel due to counsel's failure to present alibi witnesses at trial had been exhausted. The entire order reads as follows:

> Appellant, through counsel, moves for a certificate of appealability. Upon due consideration, it is ORDERED that the motion is hereby GRANTED for the following purposes: the judgment of the district court is vacated, the matter is remanded, and the district court is directed to hold Appellant's 28 U.S.C. § 2254 petition in abeyance pending the exhaustion in state court, by presenting to the state courts the affidavits, heretofore presented only to the district court, of Appellant's claim that he was denied effective assistance of trial counsel due to counsel's failure to present alibi witnesses at trial, and to reconsider the claim once it is fully exhausted.

Following remand from the Court of Appeals and further exhaustion of claims in State courts, new counsel for the present phase of the proceeding was appointed by this court. The parties were directed to produce at an evidentiary hearing, through subpoena or otherwise, State trial counsel, the proposed alibi witnesses upon whom petitioner relies, and any other witnesses who might throw light on petitioner's contention that he was

2

denied the effective assistance of counsel by his trial attorney's failure to call alibi witnesses on his behalf and by counsel's refusal to permit him to testify.

II. **Summary**

In this court petitioner (sometimes referred to as "defendant") presented testimony by his State trial attorney, Robert Koenig, and by a potential alibi witness, Carmen Salas. On his own behalf petitioner testified by telephone from prison.

Mr. Koenig was a highly credible witness. Ms. Salas was moderately credible except that she could not be believed on the critical issue of the date and time she had a chance encounter with petitioner on the early morning of the murder. Petitioner was wholly incredible.

The hearing demonstrated that trial counsel's tactics were sensible. He conducted a thorough investigation on his own and through an investigator by interviewing potential witnesses. Based on their statements, up to the time of trial he properly expected that their testimony would support petitioner's alibi. Both he and petitioner were surprised by the key alibi testimony of one Russell Edwards, an acquaintance of petitioner. It showed that Edwards was confused about the anchoring date on which Memorial Day fell in 1996, undercutting his testimony as to the alibi date.

The killing occurred in the early morning of May 30, 1996.

At trial, Edwards testified that, on that day, he saw four men approach the victim; petitioner was not among them. As Edwards left the market in a taxi, he heard a shot. Edwards testified that he remembered the day in question because he had gone to the market to pick up a stove in preparation for Memorial Day. As the jury learned by stipulation, however, Memorial Day fell on May 27 of that year - - three days before the shooting. (This confusion as to date persisted through the habeas proceedings; petitioner asserted in an affidavit that on the date of the killing he had been discussing plans for the upcoming Memorial Day weekend.)

Habeas counsel for petitioner has provided an excellent post-hearing brief dated April 5, 2006. It was supported by a full brief and a letter dated March 10, 2006, and a letter-brief dated April 13, 2006. While the petitioner's arguments at the hearing were forceful, they are ultimately not persuasive to this trier of the fact who observed the demeanor of defense attorney Robert Koenig and proposed key-witness, Ms. Salas.

In addition to the dangers that other alibi witnesses might have posed because of confusion over the date, Ms. Salas presented a substantial adverse piece of information that would have seriously impeded an acquittal: petitioner's grabbing of an iron bar and a struggle between her and petitioner that prompted her to call for help. (No independent evidence of the claimed

4

police response could be found.) The implication that petitioner seemed to have propositioned Ms. Salas about sex early in the morning on a dark street and threatened her with physical violence was not likely to endear him - - or her - - to the jury. Her recollection of the date appeared to be an afterthought, not likely to hold up under cross-examination.

All told, the decision of the defense attorney to strongly suggest that petitioner not take the stand, and that other alibi witnesses not be called, was strategically and tactically appropriate. The evidence against him was not strong; it was appropriate to rely on the State's failure of proof beyond a reasonable doubt. Petitioner was forthrightly informed by his counsel that the decision on both matters was his. He sensibly accepted his attorney's advice.

Petitioner's present testimony that he did not agree not to testify is found to be untruthful. His testimony that he wanted the alibi defense pressed after Edwards collapsed as a defense witness is found to be untruthful.

The arguments of counsel, in the instant proceeding, about whether the state remedies had been exhausted and whether the alibi issue is open for federal review are no longer relevant. *See, e.g.,* Petitioner's letter of March 10, 2006. The Court of Appeals specific direction on remand must be followed. *See Tr. of Hearing,* March 10, 2006, 147-48 (hereafter "H").

## III. Testimony in this court

<u>JAMES L. KOENIG</u>

James L. Koenig, defense counsel in the State trial, had had substantial trial experience. He testified truthfully about the manner in which he conducted defendant's trial and about the strategic considerations that informed his recommendations to his client and their joint decisions. While he candidly admitted a lack of full recollection, on the critical issues his testimony was full and credible.

Mr. Koenig noted that he took over defendant's case from another attorney, at a time when the period in which to file an alibi notice was about to expire. Because investigator's reports that Mr. Koenig received indicated that there was at least one possible alibi witness, he filed an alibi notice. Failure to file the notice could have resulted in the preclusion of alibi testimony at trial (H. 3, 36).

Mr. Koenig continued the services of the previously appointed investigator. Based upon the investigator's reports and upon Mr. Koenig's own telephone conversations with Carmen Salas, who visited his office on a number of occasions, Mr. Koenig believed that Ms. Salas could provide an alibi for defendant for the time that Kenneth Phillips was murdered (H. 3-10, 20, 42). Defense counsel was familiar with the contents of defendant's file. He prepared for trial properly with the intention of presenting an alibi

defense (H. 4-6, 39-40).

Prior to trial, Mr. Koenig had been put in touch with Russell Edwards, a witness who was prepared to testify that defendant was not at his lot when Phillips was shot there. Edwards told Mr. Koenig that he had observed a group of men approaching Phillips just as Edwards was leaving defendant's lot on the night Phillips was shot. Edwards knew defendant and defendant was not among the group of men that Edwards saw approaching Phillips (H. 12). Edwards was sure that he had left the lot just before the shooting took place; Mr. Koenig thought Edwards credible (H. 12-13).

Mr. Koenig made other efforts in support of the planned alibi defense. He attempted to locate Jean Barnes. She would have been a critical witness. She had reported to the defense investigator that defendant had driven her home on the night of the murder and that defendant had dropped her off at about 1:30 a.m. Despite appropriate serious efforts to do so, Mr. Koenig was never able to locate Ms. Barnes (H. 8-9, 11-12, 24-25, 41). He also attempted to locate two black police officers mentioned by defendant, whom he believed could assist the defense. He was not able to track those officers down (H. 25).

Mr. Koenig did locate one Smokey Allen. This person allegedly was with Carmen Salas during her purported encounter with defendant on the early morning of the murder (H. 16-17). Mr. Allen had to depend upon petitioner's or Ms. Salas' fixing of the date of the

encounter, so he had no substantial independent value (H. 17-18).

Defendant, after a "heated" discussion with counsel, did "agree" with defense counsel's analysis of the strategic situation and that he should not testify (H. 17-19).

Pursuant to the agreed-upon defense strategy before trial, Mr. Koenig made an opening statement in which he asserted that the evidence would show defendant was not at his lot at the time that Kenneth Phillips was fatally shot there. He stated that the jury would hear about where defendant was and what he was doing. Mr. Koenig also told the jury that the People's case lacked a motive because defendant had no landlord-tenant dispute with Kenneth Phillips. Mr. Koenig argued that the People's theory and their evidence were "just incredible." Mr. Koenig told the jury that one Marlon Brown steered the investigation to defendant for his own reasons, that the police had simply wanted to close this case quickly, and that defendant was innocent (H. 5-10, 20, 42; Transcript of trial 15-18 [hereafter "T"]).

At trial several developments ultimately caused Mr. Koenig to conclude - - with petitioner's explicit concurrence - - that the defense would be best served by abandoning the alibi defense (H. 11, 16). As counsel had anticipated, Edwards testified about being at defendant's lot on the night of May 30, 1996 and about seeing a group of men heading towards the deceased, Kenneth Phillips. Edwards, who knew defendant, said that defendant was not among the

group.  Edwards recalled that as his taxi drove away from the lot
he heard a shot fired.  Mr. Koenig was surprised, however, when the
witness testified that he recalled the date that he was at the lot
because he had gone there to retrieve his wife's stove so that she
could cook for Memorial Day.  This was a "bad event" for the
defense because Memorial Day had already passed by the time of
Phillips' murder and the defense was forced to enter into a
stipulation to that fact (13-15. 35, 44).

In their pre-trial discussions, Edwards had indicated that
he "was aware of the date and times when it happened," and, after
discussing "all of the particulars," Mr. Koenig had been
confident that Edwards was "talking about the same incident as
the homicide" (Koenig: H. 12-13).  In none of their pre-trial
conversations had Edwards indicated to Mr. Koenig that he was
recalling the early morning of May 30, 1996 because of some link
to Memorial Day. (H. 14).

Because Edwards' impeachment was damaging to the defense, Mr.
Koenig had to be careful not to call another witness whose
testimony about the relevant date could be impeached (H. 19, 35).
Based upon the information that Mr. Koenig had received from his
investigator, and upon his own telephone conversations with Carmen
Salas, Mr. Koenig had been comfortable that Ms. Salas could provide
an alibi for defendant for the time that Phillips was shot.  That
Ms. Salas expressed certainty about the date of her encounter with

defendant when she spoke to Mr. Koenig on the telephone was supported by Ms. Salas' testimony that she had gone "over and over and over" her story with the defense investigator several times a month for a period of six months to one year (H. 55-56, 60-61).

Mr. Koenig had had problems getting Ms. Salas to talk to him personally and he was only able to actually meet with her and talk with her face-to-face at length after the trial was in progress. Arguably, defense counsel should have seen Ms. Salas himself when she visited his office repeatedly, but he apparently left the interview to his secretary. *See* petitioner's letter of April 13, 2006, 1-3. This "lapse," if that is what it was, would not have affected any decision of counsel or defendant.

When Mr. Koenig did speak directly with Ms. Salas, he realized that she and her friend, Smokey Allen, another potential alibi witness, had a "real problem" recalling the date of their encounter with defendant. The more he spoke with Ms. Salas, the more Mr. Koenig concluded that she and Allen had been influenced as to the May 30, 1996 date by the defense investigator with whom they had spoken (H. 7, 17-20, 19-21, 25, 33, 35, 37-40, 42-43).

Because neither Ms. Salas nor Allen could establish the date of their encounter with defendant -- but defendant was sure that the encounter had taken place on May 30, 1996 -- Mr. Koenig found himself in the position of having to call defendant as well as

10

the alibi witnesses in order to establish that defendant's encounter with Ms. Salas and Allen had taken place on the date and time that Phillips was murdered.

This course of action posed problems. The account Ms. Salas had given Mr. Koenig of her encounter with defendant was different from the account that defendant had given Mr. Koenig. Ms. Salas' testimony could have been construed as meaning defendant had attempted to solicit her for sex. Ms. Salas also asserted that defendant had threatened her with violence -- a "completely opposite recollection of their encounter" from the account defendant had provided to Mr. Koenig. In Mr. Koenig's opinion, the two different accounts would have given the jury "pause to know what to believe" (H. 17-18, 21, 29, 37-38, 45-50).

Another troubling issue with respect to the alibi defense was the fact that a key witness, Jean Barnes, was missing. Defendant's alibi included his account of driving Ms. Barnes home before he encountered Ms. Salas. Ms. Barnes was someone who worked at the lot with defendant. Mr. Koenig was concerned that if defendant testified the jury would be left wondering where Jean Barnes was. For these and other reasons, Mr. Koenig came to the sound strategic conclusion that the alibi defense was not going to be viable (H. 47).

Counsel had concerns about having defendant testify. Defendant had acknowledged having problems with one Marlon Brown,

11

who was believed by defendant to be framing him. This acknowledgment would "pretty much corroborate the motive that the DA had for the homicide." Other aspects of petitioner's potential testimony were of concern to Mr. Koenig; he discussed them with defendant during the trial (H. 20-21).

During a conversation late in the trial, at which defendant indicated to counsel his desire to testify, Mr. Koenig informed petitioner that he did not think that it would be in defendant's best interests to call Ms. Salas or Allen and then call defendant to "basically impeach them with what happened during the encounter" (H. 17-18, 21-22, 33, 35, 40-41, 47-48).

Mr. Koenig pointed out to defendant the positive developments for the defense, which included some inconsistent testimony by the State's two main witnesses and what arguably was the hiding of Marlon Brown by the State. Mr. Koenig and petitioner discussed the point that defense counsel had been able to undermine the credibility of the witnesses and to drive a "wedge" between their accounts. They discussed the fact that it was still going to be the defense position that defendant was not present at the scene of the murder. They also talked about Mr. Koenig's belief that even if the jury thought that defendant was present when Phillips was shot, the evidence was clear that defendant had not fired the shot and that, at most, he had made some hand gestures -- conduct that Mr. Koenig believed might not

be enough for the jury to find that the State had met its burden
of proving defendant guilty of murder beyond a reasonable doubt
(H. 22, 24, 26, 34-35).

Mr. Koenig recalled that while this discussion with defendant
became heated, he had a "distinct recollection" that defendant
ultimately agreed with his analysis and that they decided together
not to have defendant testify and not to call any more alibi
witnesses (H. 17, 20, 22-24, 30-31, 33, 41). During their
discussion, Mr. Koenig informed defendant that it was ultimately
defendant's own decision whether or not to testify; defendant
understood his right to testify if he so chose (H. 22-23, 30). On
this critical matter defense counsel is fully credited by this
court.

Prior to trial Mr. Koenig had made a successful Sandoval
application to preclude the prosecution from inquiring about
defendant's prior menacing conviction if defendant chose to
testify. Mr. Koenig did not want defendant to be prejudiced, if he
decided to testify, by other information that could have caused the
jury to believe that defendant had a propensity to commit crimes.
(H. 31-32).

Mr. Koenig explained what went into the decision to abandon
the alibi defense that the defense had opened on:

> That it would do more harm than good, as I said
> before, to come in with evidence that didn't really make
> a lot of... sense. I had two witnesses who were going
> to testify about an incident with Mr. Bennett without

13

being able to say specifically what date they took place. In order to put a date on that, Mr. Bennett would have to testify about dropping off Ms. Barnes, who we could not locate. He would then give a different version of the events than Ms. Salas was going to talk about and try to paint himself in a different light which would perhaps lead someone to believe the two were not talking about the same event or telling the truth at all and cause further confusion. I didn't want to exacerbate any damage we had already taken from Mr. Edwards.

(H. 23).

Mr. Koenig added that the alibi defense, coming from both Ms. Salas and defendant, "would further give the jury the impression that we had problems with our defenses not adding up." He believed that it was enough at that point that the defense had attacked the State's case without coming in with "imperfect evidence which is self-contradicting" (H. 48).

### CARMEN SALAS

Carmen Salas testified that she had a clear recollection that the date of her encounter with defendant was May 30, 1996, because it took place on the same night and morning as a barbecue that had been held exactly three days after her now-seventeen-year-old daughter's birthday. She specifically recalled the date because she had been very upset that she had no money for a birthday party for her daughter and because "the person that did the favor for her" and made the barbecue told Salas not to worry because it was taking place only three days after the birthday. Ms. Salas testified that she also remembered the date because she "went

14

through it over and over and over with the investigator . . . on a monthly basis." She could not, however, recall the day of the week that this barbecue took place (H. 53, 60-61).

Ms. Salas testified that she ate some food at the barbecue and that she walked away from it sometime after 1:00 a.m. to get cigarettes from her friend Smokey. At about 1:15 a.m., while she was on her way to Smokey's, Ms. Salas encountered defendant, who was in his car looking for a parking place. Ms. Salas and defendant had a brief conversation during which defendant asked Salas to have a drink with him at his home. She accepted the invitation. Ms. Salas first wanted to get some cigarettes from Smokey. Defendant offered her ten dollars to get the cigarettes for herself, but he requested something of Ms. Salas' to hold to make sure that she returned. Ms. Salas only had her house keys and her eyeglasses with her so she gave defendant her eyeglasses because she did not trust a stranger with her keys (H. 52-55, 60, 67-71, 74-78, 87-88). Ms. Salas testified that she was not concerned about going with defendant and walking away from her young children because -- although no one was with the children -- they had already gone to sleep and two of Ms. Salas' friends were in front of the building and could look into her ground-floor apartment windows (H. 69, 87-88).

She testified that because the nearby stores were closed, she headed for Smokey's house to give him the money. Smokey had a

15

bicycle and Ms. Salas knew that he could ride to a nearby vendors. (H. 54, 77). When defendant saw Ms. Salas change the direction in which she had been walking, he became concerned that she was going to run off with his money; he made a U-turn and drove up onto the sidewalk to confront her. Ms. Salas and defendant then engaged in a heated discussion during which both she and defendant reached for a tire iron that was in defendant's car. At some point, a patrol car drove up and stopped. The officers spoke to Ms. Salas and defendant and defendant told them that Ms. Salas had taken his ten dollars. The officers said that if they made out a report, they would charge Ms. Salas with prostitution and defendant with soliciting. Defendant then said he decided not to file a report. According to Ms. Salas, she and defendant then went their separate ways. It was about 2:30 a.m. by this time and Ms. Salas forgot about getting her glasses back (H. 54-55, 71-73, 78, 86-87). Eventually, she obtained a new pair of glasses using her Medicaid card (H. 78-81).

Ms. Salas provided an explanation for why she had not simply returned defendant's money to him during their violent argument. She testified that she could not return the money because she had already given it to Smokey and he had left with it to buy the cigarettes. Ms. Salas testified that Smokey generally did favors for people in the area and that she did not feel like walking to the gas station three blocks away for cigarettes when Smokey

16

could go there on his bicycle (H. 73, 83-84). Despite the fact that she explained to petitioner that Smokey had gone to get the cigarettes for her, defendant "just wanted his $10 back" (H. 86). It was after this that the argument became violent.

Ms. Salas testified that, starting in July of 1996, she spoke to a defense investigator two or three times a month for a period of six months to one year. She recalled she did "meet" three or four times with Mr. Koenig in his office (H. 56). She received money to defray the cost of these meetings (H. 57).

At the hearing, Ms. Salas insisted that she had told the defense investigator about the barbecue held in honor of her daughter's birthday although there was no mention of that event in the affidavit that she had previously submitted in this case (H. 61-62). She testified that the investigator had typed the affidavit on his computer after Ms. Salas had written it out by hand. She initially testified that she had checked over the affidavit before signing it. Later, however, she amended her testimony and said that she had only looked at the first page of the two-page affidavit before signing it. She knew that the affidavit was an important document, but she stated that she had been tired of being repeatedly contacted about this case and then not called to testify. Ms. Salas explained, "I read some of it. I read the first page, I was like, yeah, okay, no problem, I'll write whatever I have to write down. Whatever I wrote, he typed it

17

up and I reread it briefly and just signed it. I really didn't want anything to do with the case anymore" (H. 62-63, 89, 93).

The witness acknowledged that in her affidavit she had sworn that she had forgotten about the incident with defendant "until an investigator ... paid me a visit." When Ms. Salas was questioned about how she could have forgotten the May 30, 1996 incident by July 1996 and yet specifically recalled it so clearly almost ten years later because of the three-days-after-her-daughter's-birthday-barbecue memory cue, Ms. Salas insisted that she had not forgotten about what happened "with the man. I just didn't speak to no one about it until this man came around looking for this one person, which was me." Ms. Salas asserted that she had mentioned the barbecue to the investigator, but that this information had not been included in the affidavit (H. 61, 64). She also insisted that the investigator had not provided the May 30, 1996 date to her. According to Ms. Salas, the investigator only knew that he was looking for someone who had been involved in an incident on Eastern Parkway who had left her eyeglasses in defendant's car. Because Ms. Salas was not sure who the investigator was, she told him that her name was "Carmen Ruiz" -- a name that she had never used before (H. 65-66, 91-92). She testified that she was never shown a photograph of defendant. Defendant had given her the name "Bennett" but she did not know defendant's full name until she spoke with the investigator (H. 70).

At the time of defendant's trial, Ms. Salas first indicated that she was living in a homeless shelter in the Bronx. She then testified that she was living in Norwich, Connecticut at the time of the trial (H. 57, 87, 93). She acknowledged that she had been compensated to defray the cost of trips to Brooklyn from Connecticut when, according to her testimony, she had meetings with Mr. Koenig and that she also received money for her child-care expenses (H. 56, 151; Defendant's Exhibit A at the hearing). She testified that despite having met with Mr. Koenig three or four times during defendant's trial, she never told Mr. Koenig about the barbecue-birthday party that had fixed the date of her encounter with defendant in her mind (H. 56, 66-67, 94).

### DELVILLE BENNETT

Petitioner testified via a telephone connection to the courtroom from his correctional facility. He claimed that Mr. Koenig rendered ineffective assistance as counsel. He insisted that he had expected Mr. Koenig to call Jean Barnes, Carmen Salas, Ms. Salas' friend Smokey, and two police officers to establish an alibi defense (H. 99-100).

Petitioner disputed Mr. Koenig's testimony that he had told defendant of his absolute right to decide whether or not to testify. He asserted that he had informed Mr. Koenig of his desire to testify and that Mr. Koenig had told him that it was not defendant's decision and that he was not calling defendant to

testify (H. 100). As already noted his was untrue.

Petitioner addressed the portion of his sworn affidavit in which he had asserted that on the morning that Kenneth Phillips was murdered, he had been discussing plans for the upcoming Memorial Day weekend with his employee, Jean Barnes. He testified that when he discussed the night in question with his "new" attorney, he had simply told him that he and Ms. Barnes had sat in petitioner's van until about 1:30 a.m., discussing plans for the upcoming weekend. Defendant's "new attorney" was Joel Brenner, Esq., the attorney who had represented defendant on direct appeal. According to petitioner, it was his new attorney, who drafted the affidavit for defendant's signature, who made "the same mistake" that Russell Edwards had made at trial -- writing that petitioner and Barnes had been discussing the upcoming Memorial Day weekend. He acknowledged that it was his own mistake to have "missed the error" when he read and signed the affidavit (H. 101).

Petitioner disputed the accuracy of the Detective's testimony at defendant's pre-trial hearing in which the Detective had said that defendant had been given the opportunity to give a narrative account of his activities the night before his arrest. The Detective had summarized the exculpatory statement that defendant had given -- which contained no mention of Jean Barnes or of Carmen Salas (see Pre-trial hearing transcript dated November 21, 1996 at 11-13, 50-51 -- part of respondent's Exhibit A to the original

habeas response). Petitioner testified that despite his efforts to tell the Detective about his meeting with Carmen Salas and Smokey, whose names defendant did not know at the time, the Detective did not want to hear about it (H. 101-02).

Petitioner asserted that if Mr. Koenig had permitted him to testify at trial, he would have testified that he drove Jean Barnes home on the night of the murder, arriving at her house at about 1:30 a.m. After he dropped Barnes off, he was flagged down by Carmen Salas, a stranger to him at that time. Ms. Salas told defendant that she had not had anything to eat since the morning and that she was hungry. (If believed, the discrepancy with her just coming from a birthday barbecue, cast doubt on Ms. Salas' testimony.) She then, he went on, asked defendant for some money for food. Defendant believed that she was going to run away without giving him back his change so he drove after her in his car. Defendant then got out and he argued with Ms. Salas. Ms. Salas' friend Smokey was there at the time. Defendant flagged down a passing patrol car and two black police officers came over and told defendant that they would arrest him and Ms. Salas if defendant did not drop the matter. Defendant went home after that. Defendant recalled that his encounter with Ms. Salas lasted from about 1:50 a.m. until about 3:00 a.m. The next day, when defendant went to his lot, he was attacked by people wielding machetes (H. 102).

21

During cross-examination, petitioner acknowledged that his case had already gone through numerous proceedings before he signed his affidavit in November of 2003 and that he knew that his affidavit was of the utmost importance. He agreed that he had read the affidavit before signing it and that he was aware that, by signing it, he was swearing to the truth of its contents (H. 103-04, 106). Petitioner also acknowledged that he was aware at trial, after Russell Edwards testified that he was at defendant's lot prior to Memorial Day, that this testimony had proved to be a serious problem for the defense (H. 104).

Petitioner testified that he recalled having given several statements in this case -- his statement to the Detective, his May 2002 unsworn statement, and his November 2003 sworn affidavit; he denied being aware of inconsistencies in those statements (H. 106). Defendant claimed that he had only told the Detective that he was "home" at the time of the murder when he was relating what had happened "afterwards." Although the Detective's recitation of defendant's exculpatory statement contained no mention of Jean Barnes or of Carmen Salas, petitioner asserted that he had told the Detective about Ms. Barnes and that he had tried to tell him about Ms. Salas but that the Detective would not listen to him (H. 106-07).

Petitioner agreed that he had sworn in his affidavit that it was about one month before trial when Mr. Koenig had said that he

would not allow defendant to testify because defendant was too hyper. He testified that he was distressed to hear this, but nevertheless did nothing to bring Mr. Koenig's prospective refusal to allow him to testify to the court's attention. He conceded that he was familiar with the process of having a lawyer replaced, having had Mr. Koenig's predecessor removed (H. 107-09).

When confronted with letters that he had written to Mr. Koenig before trial, none of which contained any mention of a desire to testify, petitioner refused to concede that that he had not included his desire to testify in his letters (H. 110). Defendant's letters to Mr. Koenig were in the "Addendum" to his first C.P.L. § 440 motion, at pp. A-25-29.

When asked on cross-examination if he sometimes said intemperate things when he got angry, defendant replied that he did not really consider himself to have a temper. Nevertheless, after initially denying that he had placed a "curse" on Mr. Koenig after trial, petitioner agreed that he had written to Mr. Koenig, stating that the lawyer had displeased the Lord and that God's vengeance would be cast upon Mr. Koenig and his wife and young son, and his generations to come, and that when that was happening, Mr. Koenig should "always remember Delville Bennett." Defendant also agreed that in angry letters he had accused Mr. Koenig of working together with the District Attorney to convict him (H. 111-112).

Asked on cross-examination whether he had heard Carmen Salas

23

testify that she had never asked him for money for food, defendant asserted -- for the first time in any of his statements --- that he was not certain whether it was for cigarettes or for food that Ms. Salas had requested money. After petitioner was reminded of his statement that Ms. Salas had come up to him and had said that she had not eaten all day, defendant recalled that it was "quite likely" food for which she had requested the money (H. 113).

He insisted that he had never invited Ms. Salas to his apartment for drinks and that he had never threatened her with a tire iron. He acknowledged that he did take a crowbar that was lying near an unfinished storefront in the area where his argument with Ms. Salas took place. He testified that he felt that he could use the tool on his property and that it would serve as compensation if he did not get his money back from Ms. Salas, although he knew that the crowbar did not belong to her when he picked it up (H. 114-116).

When asked on cross-examination whether he had ever told the Detective about the tire iron, defendant responded with a nonresponsive statement, asserting that the Detective was angry with him for purchasing the lot because the Detective had lived in a building near the lot and had passed through the property as a child. He also asserted that the Detective had heard many things about him from Marlon Brown (H. 134-35).

Petitioner testified that he took eyeglasses from Ms. Salas during their encounter and when he was asked why he had never mentioned this in any of his statements, he began complaining about the preparation of his first C.P.L. § 440 motion by his then attorney, Jonathan Latimer, and about the submission of unsworn statements in support of that motion (H. 135-36).

Petitioner was questioned about the statements in his November 2003 sworn affidavit, and in his May 2002 unsworn statement, to the effect that Ms. Salas had gone into an apartment building and that she had looked down at petitioner from a window. He testified that he did not recall if Ms. Salas "really entered the apartment building or not" or whether "she had went upstairs or waited on the first floor or whatever" (H. 118, 120-21). He also testified that Ms. Salas called her brother for help and that she was looking down at defendant from a window when she told him this (H. 119-20). When defendant was asked if he had heard Ms. Salas testify that morning that she had never gone into an apartment building, defendant responded, "Well, that is her story. That is Ms. Salas' story" (H. 121).

Petitioner admitted that he twisted Ms. Salas' wrist when she was near his van because he thought that she had his money in her hand. He testified that Ms. Salas did not tell him that she had already given his money to Smokey and that Smokey was riding his bicycle to a gas station to get her the cigarettes. He asserted

25

that he did not recall Ms. Salas' testimony earlier in the day in
which she had described giving defendant's money to Smokey (H. 118-
19). When petitioner was asked whether he was now aware, after
hearing Ms. Salas' testimony, that there were several differences
between her story and his, defendant responded, "No, sir" (H. 121-
22).

Petitioner asserted that after he had given his version of his
encounter with Ms. Salas to Mr. Koenig, his attorney never informed
him that Ms. Salas' version differed from his own (H. 116-117). He
agreed that Mr. Koenig had warned him that if he testified, he
would be cross-examined about the disparities between his trial
testimony and his pre-trial statement to the Detective in which
defendant had apparently said nothing about drug dealing at the lot
and had only discussed his landlord-tenant dispute with Marlon
Brown (H. 122-23). He asserted that he had tried to tell the
Detective about drug dealing but that the Detective was not
interested in hearing him (H. 123).

He did agree that he had not mentioned anything about drug
dealing at Brown's market in his May 24, 2002 unsworn statement.
He acknowledged that he had spoken in that statement of congenially
turning over control of the lot to Marlon Brown for the night (H.
123-25). He testified that although he was involved in a rent
dispute with Brown, they never confronted each other "in any kind
of hostility or angry or animosity towards the other. We always --

26

even though there was a dispute, we always lived in a congenial, loving manner still" (H. 125).

While acknowledging that Brown had a legitimate fruit market, he insisted that Brown was dealing drugs from the lot. When petitioner was asked why he turned control of the lot over to a drug dealer for the night, defendant commenced a less than lucid account of his alleged prior complaints to the police, his "congenial" conversation with Brown about Landlord-tenant court, about how defendant was a Christian, how his Archbishop and house pastors and church members supported defendant's chicken business, and how defendant had complained to Brown in the past that he could not have Brown selling drugs "right here when my Christian folks, including my Archbishop and my Minister and my church members are coming here to support me and the precinct is just about three blocks" away (H. 127-28).

Petitioner testified that he had known Russell Edwards and that they had met again in Riker's Island prison. He asserted that when he told Edwards why he had been arrested, Edwards was shocked and said, "no, not you." Edwards, according to petitioner, claimed that he had been at the lot the night of the shooting, that "he knew ... [what] took place," and that he wanted to speak to defendant's lawyer. Defendant then put Edwards in touch with Mr. Koenig. Although Edwards complained to defendant that Mr. Koenig always cut their discussions short, petitioner acknowledged that,

pursuant to his request, Mr. Koenig had called Edwards as a witness. He did realize that Edwards had hurt his case (H. 129-32). He did not recall discussing Mr. Koenig's concern that the defense not call another witness who might make a mistake regarding the relevant dates (H. 132-33).

Conceding that Mr. Koenig had indicated to him anxiety about whether Ms. Salas knew defendant or was with defendant on the day in question despite defendant's assertions that he was with Ms. Salas from about 1:30 a.m. until about 3:00 a.m. that morning, petitioner asserted,

> "I think he had a little bit of information, sir. If he had done his diligence of emphasizing or demonstration as an eloquent lawyer sit down with Carmen Salas and to investigate and to structure or buffer her properly, sir, he would have come up with the necessary information that he needed, sir. I am quite positive of that, sir"

(H. 133-34).


## IV.   Law

Defendant's claim, is based on <u>Strickland v. Washington</u>, 466 U.S. 668 (1984): that counsel's conduct was professionally unacceptable and that there is a reasonable probability that, but for the professionally unreasonable conduct, defendant would have prevailed at trial.   <u>Strickland</u>, 466 U.S. at 687-88, 694-95.

The Court of Appeals for the Second Circuit has recently restated the governing law:

An ineffective assistance claim asserted in a habeas petition is analyzed under the "unreasonable application" clause of AEDPA because it is "past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States." *Williams*, 529 U.S. at 391 (internal quotation marks omitted); *Sellan*, 261 F.3d at 309; *see also Eze v. Senkowski*, 321 F.3d 110, 124 (2d Cir. 2003); *Aparicio v. Artuz*, 269 F.3d 78, 95 & n.8 (2d Cir. 2001), *Strickland* established a two-prong test to determine whether counsel has been ineffective. A defendant must prove that: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688, 694; *see Wiggins v. Smith*, 539 U.S. 510 (2003); *Aparicio*, 269 F.3d at 95; *see also Clark v. Stinson*, 214 F.3d 315, 321 (2d Cir. 2000).

A criminal defendant <u>has a high burden to overcome to prove the deficiency of his counsel</u>.

To determine whether a counsel's conduct is deficient, "[t]he court must . . . determine

29

whether, in light of all of the circumstances, the
identified acts or omissions were outside the wide
range of professionally competent assistance." In
gauging the deficiency, the court must be "highly
deferential," must "consider[] all the
circumstances," must make "every effort...to
eliminate the distorting effects of hindsight," and
must operate with a "strong presumption that
counsel's conduct falls within the wide range of
reasonable professional assistance...."

*Lindstadt v. Keane,* 39 F.3d 191, 198-99 (2d Cir. 2001)
(quoting *Strickland,* 466 U.S. at 688-89, 690)
(alternations and omissions in *Lindstadt,* internal
citations omitted). As a general rule, a habeas
petitioner will be able to demonstrate that trial
counsel's decisions were objectively unreasonable only
if "there [was] no...tactical justification for the
course taken." *United States v. Luciano,* 158 F.3d 655,
660 (2d Cir. 1998) (per curiam); *see Strickland,* 466
U.S. at 689 (holding that petitioner must "overcome the
presumption that, under the circumstances, the
challenged action must be considered sound trial
strategy").

    As for prejudice resulting from counsel's

inadequate performance:

> An error by counsel, even if professionally
> unreasonable, does not warrant setting aside the
> judgment of a criminal proceeding if the error had
> no effect on the judgment. To merit habeas relief,
> the defendant must show that the deficient
> performance prejudiced the defense. The level of
> prejudice the defendant need demonstrate lies
> between prejudice that had some conceivable effect
> and prejudice that more likely than not altered the
> outcome in the case. Thus [t]he <u>defendant must
> show that there is a reasonable probability that,
> bur for counsel's unprofessional errors, the result
> of the proceeding would have been different." The
> Court defined reasonable probability as one that
> undermine[s] confidence in the outcome.</u>

*Lindstadt,* 239 F.3d at 204 (alterations in original,
internal quotation marks and citations omitted); *see also
Aparicio,* 269 F.3d at 95 (citing *Strickland,* 466 U.S. at
694); *Flores v. Demskie,* 215 F.3d 293, 304 (2d Cir.
2000). In making the "reasonable probability"
determination:

[A] court hearing an ineffectiveness claim must
consider the totality of the evidence before the
judge or jury. Some of the factual findings will
have been unaffected by the errors, and factual
findings that were affected will have been affected
in different ways. Some errors will have had a
pervasive effect on the inferences to be drawn from
the evidence, altering the entire evidentiary
picture, and some will have had an isolated,
trivial effect. Moreover, a verdict or conclusion
only weakly supported by the record is more likely
to have been affected by errors than one with
overwhelming record support. Taking the unaffected
findings as a given, and taking due account of the
effect of the errors on the remaining findings, a
court making the prejudice inquiry must ask if the
defendant has met the burden of showing that the
decision reached would reasonably likely have been
different absent the errors.

*Strickland,* 466 U.S. at 695-96. Failure to show "either
deficient performance or sufficient prejudice defeats the
ineffectiveness claim." *Id.* at 700.

*Lynn v. Bliden,* 2005 Session slip sheet 1941, 1956-59, ___F.3d___,
___ (2d Cir., March 30, 2006) (emphasis added).

32

## V. Application of Law to Facts

As is apparent from Part III, *supra,* James L. Koenig, petitioner's trial counsel, credibly described his cogent reasons for discouraging testimony by defendant; for not calling other alibi witnesses; and for abandoning the alibi defense that the defense had intended to present.

On the positive side for the defense, Mr. Koenig had good reason to conclude that the State's witnesses had not been consistent and that he had significantly undermined their credibility. Mr. Koenig also reasoned that the State had presented very little evidence actually tying defendant to the fatal shot, which the State had conceded was not fired by defendant. Thus, given the trial developments, Mr. Koenig properly concluded that the defense would be best served by abandoning the alibi defense and focusing on attacking the State's case.

Mr. Koenig's testimony at the hearing was credible and supported by the trial record, which shows his thorough and aggressive cross-examination of the State's witnesses and his forceful objections throughout the trial (T. 26-32, 51-65, 85-102, 162-210, 236-37, 242-46, 307-39). The record shows that Mr. Koenig elicited from the Detective that his homicide analysis sheet indicated that Marlon Brown's market was a known drug location. It shows that, in support of the defense position that

Phillips' murder was drug-related, Mr. Koenig elicited from an eyewitness, Highland Roberts, that Roberts' sales in the market resulted in "at least 1800 every day" and that the three other workers took in money too -- all of which went to Marlon Brown (T. 89, 181-82). Mr. Koenig elicited from Roberts an assertion that Phillips did not smoke marijuana -- testimony that he thereafter impeached with evidence from the medical examiner that traces of marijuana had been found in Phillips' bloodstream (T. 187, 262). Mr. Koenig also undermined Roberts' testimony that a caustic substance had been sprayed into Phillips' eyes before he was shot, by eliciting from the medical examiner that the autopsy report did not indicate the presence of any such substance on Phillips' face (T. 260-61).

Mr. Koenig highlighted for the jury various inconsistent statements that Roberts had made (T. 188-89, 191-93, 199-201, 204-05). He elicited from Roberts, who claimed that he could recognize defendant's car, that defendant had a large Jamaican hood ornament on that car -- testimony that Mr. Koenig would later impeach with a photograph of defendant's car that showed that it had no ornament (T. 198, 236-37).

Mr. Koenig delivered a forceful summation in which he argued that the State's witnesses were working with Marlon Brown, a drug dealer, and that those witnesses were "advocates" for Brown, attempting to frame defendant for Phillips' murder so that they

34

could continue their drug business unfettered by defendant's presence and interference (T. 456-58, 461, 477). He called attention to the inconsistencies in the witnesses' testimony and to the State's failure to produce Marlon Brown despite the prosecutor's promise in her opening statement to provide extensive evidence of defendant's landlord-tenant dispute with Brown (T. 454, 458-60, 463-65, 467-68, 471-72, 474-76, 478). He pressed his argument that this murder was drug-related by sarcastically recalling Roberts' testimony that Brown's market did thousands of dollars worth of business a day selling only fruits, juice and small grocery items -- telling the jury, "at the end of the day; he's got two grand in his pocket from selling coconuts. We should all sell coconuts if you end up with $2,000." He argued,

> "Are we to believe that this vegetable stand takes in thousands upon thousands of dollars a day, all going to Marlon Brown, but it is not a drug spot? That's ridiculous and it is deception and when someone is trying to deceive, you have got to know that, recognize it, and say, I don't trust you, Major Avaloy, I don't trust you Highland Roberts. I'm not going to convict somebody of murder based on what you have to say"

(T. 470).

Mr. Koenig also did what was reasonably possible to salvage some benefit from Russell Edwards' testimony. He acknowledged Edwards' criminal record but argued that, "you don't have to be a saint to come in here and say what happened" (T. 486). In support of his position that the State's chief witnesses -- Roberts and one

Avaloy -- were not present at the scene of the shooting, Mr. Koenig argued that Edwards' testimony that nobody was at the lot but Phillips made sense because, otherwise, the shooter would have made sure that the witnesses were "accounted for." Mr. Koenig stated that he did not know whether or not the witnesses would have been shot but he argued that, "they wouldn't have just pretended they were made of wood" (T. 487).

With respect to the problems with Edwards' testimony, Mr. Koenig put the best possible light on it when he argued:

> Now, we stipulated that Memorial Day was actually three days before this happened. Mr. Edwards testified that he was getting the stove to his woman to cook for Memorial Day, okay? Is he wrong about that? May have been. You decide if that's an important fact that you look at and say, forget his testimony.

(T. 486-87). He added:

> The man's story has a ring of truth to it. There is nothing nefarious about coming to the lawyers, to the person that you are going to testify for. It just makes sense. He knew at that p[o]int that he had information to give, and I submit to you, when you look at how ridiculous the testimony of Avaloy and Roberts is, his testimony makes s[ens]e that Patrick was alone.

(T. 487).

Mr. Koenig strongly suggested that defendant was innocent and that the "culprits are out there but were not brought in this courtroom. What was brought here was an injustice and we are asking you fix it" (T. 488).

Petitioner's position that it was ineffective of Mr. Koenig to

36

abandon the alibi defense under all of the circumstances present in this case is meritless. As the hearing before this court made evident, the alibi defense would have been at best extremely weak, and at worst extremely damaging. It was going to have to be established by the testimony of witnesses who were going to contradict each other about critical aspects of their alleged encounter.

As Mr. Koenig recognized, at the very least, the alibi defense would have been confusing to the jury. At the hearing before this court, after the State's attorney had questioned defendant about the inconsistencies between his account and Ms. Salas', defendant responded, as already noted, testily, "Well, that is her story. That is Ms. Salas' story," as if Ms. Salas would have been a State's witness for him to impeach rather than his own alibi witness (H. 121).

Defendant's hearing testimony indicated that he would have made efforts to tailor his testimony to Ms. Salas' and that pitfalls awaited him if he did so at trial. For example, despite having consistently taken the position in his pre-hearing statements that Ms. Salas had approached him for money for food, telling him that she was hungry and had not eaten, for the first time defendant testified at the hearing that he did not recall whether Salas had asked for money for cigarettes or for food. Once defendant was confronted with his detailed prior statements he

37

asserted that Ms. Salas had, in fact, begged for money for food --
testimony that was inconsistent with Ms. Salas' testimony that she
had just eaten at the barbecue and was not hungry when she met
defendant.

Similarly, defendant's significantly different accounts
regarding the presence of, and his use of, a tire iron during his
alleged altercation with Ms. Salas demonstrate just how tangled-up
defendant could become in trying to conform his account to that of
Ms. Salas.  Defendant went from (1) not mentioning Ms. Salas at all
in his statement to the Detective, (2) mentioning in his May 2002
unsworn statement that he had had an altercation with Ms. Salas but
including no mention of a tire iron, (3) mentioning, in his
November 2003 affidavit, having picked up an iron bar during his
dispute with Ms. Salas, but contending that he had just taken the
tool as compensation for the money he had given her, (4) asserting
in his October 3, 2005 affidavit in support of his motion to re-
open his habeas petition, on page 6, that, "although petitioner
threatened Ms. Salas with a tire iron, it was during an altercation
at the same time as petitioner was <u>allegedly</u> committing murder"
(emphasis in original) to (5) testifying at the hearing in this
court that he picked up a crow bar and "laid it at the sliding door
of [his] van," never threatening Ms. Salas with it at all (H. 115).
That petitioner was attempting to tailor his account to that of Ms.
Salas' was evident.  A prosecutor would have subjected him to a

38

brutal cross-examination had he testified at trial.

In Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) the Court of Appeals for the Second Circuit recognized that an attorney cannot be found ineffective for eschewing a potentially fruitful course of action if that action also entailed a "significant potential downside." The court reiterated that "[c]ourts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." Id. at 323. Quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam), the court stated, "[t]he decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." Id. See also Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003) (the failure to call a witness usually falls under the realm of trial strategy that courts are reluctant to disturb, particularly where the failure to call the witness was grounded in some strategy that advanced the client's interest); United States v. Neresian, 824 F.2d 1294, 1321 (2d Cir. 1987) (the decision whether to call witnesses on behalf of the defendant and which witnesses to call is a tactical decision of the sort engaged in by defense attorneys in almost every trial).

Here, where the alibi defense turned out to be so fraught with difficulties, it cannot be argued that exercising it was a potentially fruitful course of action. There was a discernable

39

downside to it.

Mr. Koenig's decision not to call more than the one damaging alibi witness may not be second-guessed. In <u>Henry v. Poole</u>, 409 F.3d 48, 64-66 (2d Cir. 2005), the Court of Appeals for this Circuit found a defense attorney ineffective for presenting an alibi defense that turned out to be for the wrong date. The court noted in that case that a false alibi demonstrates consciousness of guilt and that a poorly prepared alibi is worse than no alibi at all -- particularly where the State's case is weak. Id. at 65. <u>See</u> <u>also</u> <u>Loliscio v. Goord</u>, 263 F.3d 178, 190-91 (2d Cir. 2001) (recognizing that a false alibi demonstrates consciousness of guilt). Mr. Koenig wisely avoided putting the defense in a position of weakness, and concentrated instead on aggressively attacking what he believed to be the prosecution's weak case.

This case is not similar to <u>Pavel v. Hollins</u>, 261 F.3d 210, 222-23 (2d Cir. 2001) or <u>Lindstadt v. Keane</u>, 239 F.3d 191, 200-01 (2d Cir. 2001), cited by petitioner, where defense attorneys failed to conduct adequate investigations and failed to call witnesses whose testimony would have been close in its force to an alibi.

Mr. Koenig employed an investigator and spoke repeatedly with defendant about alibi. He was prepared to present the alibi defense when it seemed viable. It was only during a face-to-face

meeting with Ms. Salas that she revealed just how impeachable her
recollection of the date of her supposed encounter with defendant
was -- something that had not been apparent in Mr. Koenig's
telephone conversations with her -- due, possibly, to her
extensive preparation by the defense investigator over the course
of many months.  Mr. Koenig's tactical decision not to call Ms.
Salas was reasonable.

As the hearing also revealed, both defendant and Ms. Salas
would have been weak witnesses even without the added burden of
contradicting each other.  Despite defendant's denials of an
intemperate personality, the record revealed that defendant could
become angry and say things that showed his volatile nature.
Defendant's eruption at the rendering of the verdict and his angry
letters to Mr. Koenig (some of which were written pre-trial)
indicated a level of ill temper that an effective defense attorney
would not want displayed in a courtroom, particularly where
defendant was facing allegations that he became angry enough at the
disrespect shown to him by Marlon Brown and Kenneth Phillips to
bring a squad of armed killers to their lot (A 25-29).

From the Sandoval hearing that he conducted, Mr. Koenig knew
that defendant had a prior conviction for menacing that appeared
to involve a road-rage incident when defendant either cut off or
was cut off by another car and he took out a knife and slashed a
tire on the other car.  Mr. Koenig successfully argued that the

State not be allowed to question defendant on that conviction if defendant testified because it was from 1982 and because the only purpose in offering it "would be to show he has a proclivity to violence" (Voir dire transcript dated December 1-2, 1997 at 3-4). If Mr. Koenig placed any credence in Ms. Salas' version of her encounter with defendant, whatever its date, then Mr. Koenig would have had reason to believe that, within minutes of meeting Ms. Salas, defendant had acted in a rage, twisting her wrist and threatening her with a tire iron over a few dollars.

Petitioner's post-trial letter to Mr. Koenig, in which he placed a curse on Mr. Koenig's family and future generations, belied defendant's testimony that he did not have an intemperate personality. A careful and effective defense attorney would certainly be wary of subjecting someone so volatile to the rigors of cross-examination. See People v. Civitello, 152 A.D.2d 812, 814 (3d Dep't 1989) ("Considering defendant's lengthy criminal record and propensity to explosive courtroom behavior, it cannot be said that defense counsel's advice to defendant not to take the witness stand was erroneous as a matter of law" [citation omitted]).

The hearing in this court show that petitioner had a tendency to lose focus and ramble in a manner that sometimes approached incoherence -- a trait that must have been obvious to Mr. Koenig when he spoke repeatedly with defendant (S. 12-30; H. 127-29, 134-35). His inclination towards bluster was something that an

42

experienced defense attorney had to take into account in considering the wisdom of defendant testifying. Mr. Koenig also knew from the pre-trial hearing transcript that defendant had a gun arrest in January of 1996 (see Hearing transcript dated November 21, 1996 at 6). While defendant could not be questioned about that incident, there was always the risk that he could blurt out something that would permit reference to the gun.

The Court of Appeals for the Second Circuit has recognized that a claim that the defendant was prevented by his counsel from testifying was one that "can be, and is often, made in any case in which the defendant fails to testify -- based solely on his own highly self-serving and improbable assertions." Chang v. United States, 250 F.3d 79, 84-86 (2d Cir. 2000). The court affirmed the district court's denial of habeas relief, concluding that "[t]rial counsel's affidavit is not inconsistent with Chang's wanting to testify, albeit having been dissuaded by counsel after arduous discussions." Id. at 86.

The record in the instant case supports the conclusion that Mr. Koenig dissuaded rather than prohibited defendant from testifying because he beleived that defendant would make a poor witness. The record supports the conclusion that defendant ultimately agreed with Mr. Koenig's recommendation, despite his initial desire to testify.

The hearing record reveals that Carmen Salas would have been a

43

poor witness and that Mr. Koenig wisely refrained from calling her.
Ms. Salas' testimony contained implausible statements.
Questionable was her testimony that she absolutely recalled that
her encounter with defendant had taken place on May 30, 1996,
because it occurred on the same night and early morning that Ms.
Salas' friend had a mini-barbecue in honor of Ms. Salas' daughter's
birthday -- three days after that birthday. In none of Ms. Salas'
prior statements, both sworn and unsworn, had Ms. Salas ever
mentioned this barbecue that was now so firm in her memory. In her
sworn affidavit, dated October 30, 2003, Ms. Salas had stated that
until a defense investigator contacted her on July 9, 1996, she had
"forgotten about the incident" with defendant -- an incident that,
according to Ms. Salas' hearing testimony, might have been
memorable because it almost resulted in her arrest for prostitution
and it caused the loss of a valuable pair of glasses that took some
effort for her to replace. Ms. Salas conceded that despite a
number of discussions with Mr. Koenig, she never told him that she
recalled the encounter with defendant because it occurred on the
same night and morning as the barbecue (H. 66). Mr. Koenig cannot
be faulted for deciding that, independent of defendant's testimony,
she could not establish an alibi for defendant. Other aspects of
this young mother's story were so bizarre as to be self-impeaching.

      Mr. Koenig's failure to follow through on the course that he

had set in his opening statement was not seriously prejudicial. The State as well did not deliver the case that it had promised in the prosecutor's opening statement. After promising that evidence of Marlon Brown's longstanding dispute with defendant would be provided and after the prosecutor had asserted in her opening that the jury would learn that Brown was "there, but not visible to the defendant" at the time of the shooting, and, further, that the jury would "learn that a couple of days leading up to this incident, there was a confrontation between defendant and Marlon Brown" (T. 9-11), the People failed to call Brown and failed to introduce any evidence about his whereabouts during the murder.

In analyzing ineffective assistance of counsel claims under Strickland courts may assume that counsel's conduct falls within the wide range of reasonable professional assistance. The standard is one of objective reasonableness. The first prong of the Strickland test is not satisfied merely by showing that counsel employed poor strategy or made a "wrong" decision. Instead, it must be shown that counsel made errors so serious that counsel was not functioning in a way guaranteed by the Sixth Amendment. Courts try to eliminate the "distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. at 689. See also Wiggins v. Smith, 539 U.S. 510, 523 (2003)

(assessment of challenged conduct must be "context-dependent").
In the instant case, defendant failed to meet his burden of
demonstrating that Mr. Koenig performed incompetently.

Pursuant to the two-pronged Strickland test, in order to
establish entitlement to habeas relief, defendant must
establish both that Mr. Koenig's conduct of defendant's trial
was professionally unacceptable and that there is a reasonable
probability that, but for that conduct, the verdict would have
been different. Strickland v. Washington, 466 U.S. at 687-88.
Here, defendant has failed to demonstrate that even if it was
unreasonable for Mr. Koenig to have abandoned the alibi
defense, his decision to do so affected the verdict. As
noted, defendant and Ms. Salas would have contradicted each
other and each one of them, individually, would have been
subject to serious impeachment. It is improbable that their
testimony would have caused the jury to reject the testimony
of eyewitness Highland Roberts -- a witness the jury found to
be credible.

Defendant and Ms. Salas would have impeached each other
and the absence of Jean Barnes, defendant's own employee, who
was not available, would have further undermined defendant's
account. While defendant suggests that Ms. Barnes' absence
was insignificant because she did not provide an alibi for
defendant for the exact time of the murder (Defendant's post-

46

hearing memorandum at 17-18), Mr. Koenig was not unreasonable in his belief that Ms. Barnes' absence would be held against the defense. Highland Roberts had testified that defendant came to the lot alone and threatened Phillips about one-half hour before defendant returned with his van full of thugs, one of whom shot Phillips to death (T. 122-27, 131, 203-05). If Roberts' statement was to be impeached, accounting for defendant's moment before the time of the murder was important to show that defendant did not have an opportunity to round up a gang of murderers before Phillips was shot.

Defendant has failed to establish that the verdict would have been any different had he and Ms. Salas testified. Whether any decision of the Appellate Division was entitled to AEDPA weight is irrelevant here. Under any standard of proof petitioner has failed to make out a case. The record does not support the claim that defense counsel deprived him of his right to testify or that he rendered ineffective assistance during trial.

## VI. Conclusion

The petition for a writ of habeas corpus is denied. A certificate of appealability is granted on the issue of whether petitioner was denied effective assistance of trial counsel because of counsel's failure to present alibi witnesses at trial.

SO ORDERED.

Jack B. Weinstein
Senior U. S. District Judge

Dated: April 21, 2006
      Brooklyn, New York

48